992 So.2d 206 (2008)
Anthony WELCH, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-698.
Supreme Court of Florida.
September 25, 2008.
*208 James S. Purdy, Public Defender, and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
Anthony Welch appeals his death sentences for the murders of Rufus and Kyoko Johnson. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because the trial court failed to ask the State for a gender-neutral ground when Welch timely objected to the State's peremptory challenge to a female juror as required by Melbourne v. State, 679 So.2d 759 (Fla. 1996), we vacate Welch's death sentences and remand the case for a new penalty phase.

FACTS AND PROCEDURAL HISTORY
Sometime in the morning of December 14, 2000, Anthony Welch arrived at the *209 home of Rufus and Kyoko Johnson. Welch told Kyoko that his car had broken down, and Kyoko gave Welch a ride home. Later in the evening, Welch returned to the Johnsons' home intending to at least rob the Johnsons. Welch admitted to law enforcement that he killed the Johnsons by hitting them with an object or objects. Rufus was found lying on the floor next to a sofa in the living room. He was bruised, cut, and stabbed in the face. Some of his bones were fractured from multiple severe blows to his face and the back of the head. His throat was deeply cut. Kyoko's body was found on a bed in the master bedroom. Kyoko was struck and had severe bruising on her face, forehead, neck, hands, arms, legs, and ankles. She was also strangled, stabbed in the face, and cut on the throat. All of Kyoko's wounds were inflicted while she was alive. The medical examiner testified that it took "several minutes" to inflict the wounds on both victims.
After killing the Johnsons, Welch cleaned himself up in the bathroom and took numerous items from the home. However, before leaving the Johnsons' home, Welch used their telephone to call Lisa Headley, a young woman he was dating. Welch also took Rufus Johnson's truck. Around 12:30 a.m. on December 15, 2000, Welch drove Rufus's truck to a Wal-Mart where he met Headley. Headley testified that Welch was pale and trembling but did not appear intoxicated or under the influence.
On December 19, 2000, the victims' bodies were discovered by their children. The criminal investigation revealed that Welch pawned some of the items stolen from the victims' home and kept some of the items in his apartment. During Kyoko's autopsy, the medical examiner retrieved a note from her clothing. The note instructed Rufus to go to his bank and get money or Kyoko would be killed, additionally stating, "I don't want to kill you John. I owe you for trying to save my brother's life." Police subsequently discovered that Rufus had tried to resuscitate Welch's older brother after he committed suicide in 1995. In 1995, the Welch family, including Anthony Welch, lived next door to the Johnsons. On December 21, 2000, Anthony Welch was arrested by law enforcement and subsequently confessed.
Welch was indicted on charges of (1) first-degree premeditated murder of Rufus Johnson; (2) first-degree premeditated murder of Kyoko Johnson; (3) robbery with a deadly weapon; (4) dealing in stolen property; and (5) grand theft of a motor vehicle. Welch filed a motion to suppress the admissions he made to the police on December 21, 2000. The trial court granted Welch's motion to suppress with respect to the statements made while en route to the sheriff's office but denied the motion in respect to Welch's confession at the sheriff's office.
Welch subsequently pled guilty to all counts. During the plea colloquy, Welch indicated that he had consulted with his counsel and understood the nature and consequences of the charges against him, including the possibility of a death sentence. Welch also indicated that his guilty plea was not influenced by any threat or promise.
At the penalty phase, the State introduced physical evidence and witnesses to establish the aggravating circumstances. The jury watched Welch's videotaped confession. Several of the victims' relatives and neighbors testified regarding the circumstances and details leading up to the discovery of the Johnsons' murders. Furthermore, Agent Terry Laufenberg with the Brevard County Sheriff's Office testified regarding the crime scene. Additionally, Heather Bartczak, Welch's roommate, and Lisa Headley, Welch's girlfriend, testified *210 regarding various details of Welch's life surrounding the time of the Johnsons' murders.
Welch presented mitigation evidence, including the testimony of two mental mitigation experts.
On November 21, 2005, the jury unanimously recommended a sentence of death for each of the two murders. A Spencer[1] hearing was held on January 6, 2006. On March 7, 2006, Welch was sentenced to death.[2]
Welch appeals his death sentences, raising multiple claims.[3] Because we hold that the trial court's failure to request the State's reason for peremptorily striking a prospective female juror amounts to reversible error and reverse on that ground, we address the peremptory strike issue first.[4]

ANALYSIS

Peremptory Strike
Welch claims that the trial court committed reversible error by refusing to ask for a gender-neutral basis when the State used a peremptory challenge to strike a prospective female juror. We agree and remand for a new penalty phase.
During jury selection, the prosecutor struck a prospective female juror. The defense objected and asked for a gender-neutral *211 basis for the State's peremptory challenge. The colloquy went as follows:
MR. PARKER [Prosecutor]: Strike Ms. Napolitano.
THE COURT: State accept No. 3?
MR. MCCARTHY [Defense Counsel]: Judge, we would challengejust a second we would ask Neil, Slappy, and Melbourne for a nongender basis for that.
THE COURT: This is his very first challenge.
MR. MCCARTHY: That's fine. Gender is a specific group. There has to be a nongender basis for a peremptory challenge.
MR. PARKER: Does there have to be a pattern?
MR. MCCARTHY: No, absolutely not. You don't need a pattern. The first one is as good as the last one.
THE COURT: So if he exercised a challenge against a male that would be a gender based challenge?
MR. MCCARTHY: Actually, there is a case that says that.
THE COURT: Show me.
MR. MCCARTHY: Thompson v. State, 648 So.2d 323.
Women are
THE COURT: I need to see the case. I don't take summaries. I need to see the case.
MR. MCCARTHY: I don't have the case. Every group or every person is a-peremptories are a jokeevery person is a group. Member of a group. There has to be a nonwhatever base, basis for.
MR. PARKER: Wouldn't there have to be a basis for making the basis such as
MR. MCCARTHY: She's a female. That is the basis.
MR. PARKER: Such as the defendant is a member of that particular group.
THE COURT: Or that she is the only female on the jury, which is not the case.
MR. MCCARTHY: With all due respect, both of those pronouncements are simply wrong under the case law.
...
MR. MCCARTHY: Judge, I don't have the case in front of me. It doesn't have the pattern that helps show if there has been a pattern of it, it helps whoever is objecting to the peremptories is inappropriate. It buttresses the challenge for the peremptory but it is not for 
THE COURT: I'm not going to require that on the State's first strike.
Defense counsel also cited Abshire v. State, 642 So.2d 542 (Fla.1994), a case in which this Court held that gender was a valid basis to object and that a gender neutral justification cannot be inferred from the composition of the panel.
In Florida, potential jurors, as well as litigants, have an equal protection right to jury selection procedures free from discrimination based on gender, race, or ethnicity. See Abshire v. State, 642 So.2d 542, 544 (Fla.1994); Frazier v. State, 899 So.2d 1169, 1175 (Fla. 4th DCA 2005). In Melbourne v. State, 679 So.2d 759 (Fla.1996), we set forth the guidelines for resolving a claim of discriminatory use of peremptory challenges. Melbourne, 679 So.2d at 764; see also Dorsey v. State, 868 So.2d 1192, 1198-99 (Fla.2003). Specifically, we stated:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements *212 are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3).
Melbourne, 679 So.2d at 764 (footnotes omitted). Abshire also states:
The fact that several women were seated as jurors is of no moment, for as we have previously said "number alone is not dispositive, nor even the fact that a member of the minority in question has been seated as a juror or alternate." State v. Slappy, 522 So.2d 18, 21 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988); see also Johans, 613 So.2d at 1321 ("A [gender-neutral] justification for a peremptory challenge cannot be inferred merely from circumstances such as the composition of the venire or the jurors ultimately seated.").
Abshire, 642 So.2d at 544-45.
In this case, Welch made a sufficient step one objection by objecting to the State's peremptory challenge to Ms. Napolitano, alleging that Ms. Napolitano belonged to a specific gender group and requesting the State to provide a gender-neutral reason for the strike. See Carrillo v. State, 962 So.2d 1013, 1016 (Fla. 3d DCA 2007) (finding the defense counsel's statement, "I object. He's a man. She wants to get more women on the jury," sufficient to require an explanation of the strike), review denied, 973 So.2d 1119 (Fla.2007); Thomas v. State, 885 So.2d 968 (Fla. 4th DCA 2004) (finding a sufficient step one objection where the defense objected on the ground that the prospective juror was black and a member of a distinct racial class and asked for a race-neutral reason).
The trial court misapplied well-established law by assuming that if there were other females on the jury or if the strike was the first such strike, no non-gender reason need be given. Simply put, the trial court failed to follow Melbourne after Welch made a qualifying step one objection. Instead of requesting the State's reason for the strike, the trial judge focused on the grounds for the defense's objection. This failure constitutes reversible error. See Abshire, 642 So.2d at 545 (reversing the defendant's conviction, vacating his death sentence, and remanding the case on the ground that the State's gender-based peremptory challenge violated the prospective juror's and the defendant's rights to equal protection); Alsopp v. State, 855 So.2d 695 (Fla. 3d DCA 2003) (reversing the trial court based on its failure to conduct an inquiry after the defense properly put the State's strike of a prospective juror at issue).
Since Melbourne, we have repeatedly reaffirmed the viability and value of the simplified procedure set forth in that decision. Moreover, in Dorsey v. State, 868 So.2d 1192 (Fla.2003), despite disagreement over steps two and three, the Court expressed no disagreement with the simplified first step. Id. at 1199-1201, 1203-05.
The dissent's argument for receding from Melbourne was recently addressed by Justice Pariente in State v. Whitby, 975 So.2d 1124 (Fla.2008) (Pariente, J., concurring). We agree with that analysis. There is no need to address it further except to specifically quote from the conclusion of Justice Pariente's concurrence in Whitby:

*213 As the amici [in Whitby] state, "Melbourne establishes a simple, precise, and easy-to-administer procedure for challenging a litigant's suspected use of a peremptory challenge to discriminate based on race or other impermissible factors.... The `simplified inquiry' adopted by this Court recognizes that little is required to request, and evaluate, a neutral explanation, but too much is lost if discrimination is permitted to remain undetected." Brief of Amici Curiae at 2.
There is no perfect solution to the problem of discrimination in jury selection. The values that this Court has sought to protect since Neil have been not only the rights of the defendants or other litigants but those of the excluded group member, and in the end the promotion of the fair and even-handed administration of justice. For all these reasons, I conclude, as does the majority in this case by discharging jurisdiction, that there is no compelling reason presented to recede from Melbourne.

975 So.2d at 1130 (Pariente, J., concurring). Accordingly, we remand for a new penalty phase. In light of our reversal, we touch briefly on some of the remaining claims in order to provide guidance for the new penalty phase.

Suppression of Confessions
Welch claims that the trial court erred in denying his motion to suppress the incriminating confession he made at the Brevard County Sheriff's Office. We do not agree. On December 21, 2000, Sergeant Allie Roberts and Agent Gary Harrell took Welch to the sheriff's office where Agents Howard Wells and Roberts conducted an interview with him. Before the interview began, Roberts read Welch his Miranda[5] rights. Welch stated he understood his rights, initialed and signed a waiver, and further said he wished to speak with the officers. Welch, Roberts, and Wells spoke for approximately one and a half hours, until Welch stated twice that he did not wish to talk anymore. At this point the questioning stopped. Before leaving the room, Wells arrested Welch and handcuffed him.
Harrell returned to the interview room to obtain and fill in Welch's personal information on the arrest document. After Harrell finished obtaining the necessary personal information, Welch was left alone for approximately forty-five minutes. Welch then knocked on the door, and Harrell went back into the room. Welch requested water. Before Harrell escorted Welch out of the room and to the water cooler, he warned Welch, "If you run, I am going to kill you, okay? I am a damn good shot. Alright?" While they were at the water cooler, Welch asked Harrell, "What is going to happen to me now?" Harrell said he expected Welch would be tried for the Johnson murders and face a sentence of life or death. Harrell told Welch that the police did not have his side of the story, but based on all of the other evidence, Welch could be found guilty. At that point, Harrell testified that Welch said he wanted to tell his side of the story. Harrell told Welch that he would speak to him, but only in the presence of another officer, namely Wells.
Once Welch, Harrell, and Wells were back in the interview room, Harrell again advised Welch of his Miranda rights. He then asked Welch, "What do you want to say?" Welch replied, "I don't know what to say." Harrell told Welch to "just say it." After a few minutes, Welch began speaking to the agents and made some incriminating statements.
*214 At the suppression hearing, Welch testified that he cooperated with law enforcement in order to avoid the death penalty. Welch also testified that he did not tell the agents why he was cooperating because he did not think "it would do any good to tell them." At no time did Welch ask for an attorney.
Welch argues that the trial court erred in denying his motion to suppress the statements made during the precinct interviews. Because law enforcement did not violate Welch's constitutional rights in obtaining these statements, the trial court did not err in denying Welch's motion to suppress.
This Court has explained the standard of review for orders on motions to suppress:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues....
Connor v. State, 803 So.2d 598, 608 (Fla. 2001).
In Miranda, the United States Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against self-incrimination requires advising a prospective defendant that he has the right to remain silent and also the right to the presence of counsel. 384 U.S. at 479, 86 S.Ct. 1602; Edwards v. Arizona, 451 U.S. 477, 481-82, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). After being advised of his rights, if an accused indicates that he wishes to remain silent, "the interrogation must cease." Miranda, 384 U.S. at 474, 86 S.Ct. 1602; see also Edwards, 451 U.S. at 482, 101 S.Ct. 1880. However, even when an accused has invoked the right to silence or right to counsel, if the accused initiates further conversation, is reminded of his rights, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted. See Oregon v. Bradshaw, 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
Here, Welch's statements made during his first interview at the sheriff's office were clearly admissible because they were made pursuant to a voluntary, knowing, and intelligent waiver. The interview only started after Welch was advised of his Miranda rights, stated that he understood his rights, and initialed and signed the waiver document. And the interrogation stopped when Welch invoked his right to silence. Therefore, Welch's statements before his request to stop the interview are clearly admissible.
The critical question here is whether Welch's self-incriminating statements made during the second interview after the trip to the water cooler were admissible. Because (1) Welch initiated the conversation with law enforcement and (2) confessed only after being re-Mirandized and making a second voluntary, knowing, and intelligent waiver, his confession was admissible.
First, having been left alone for more than forty-five minutes, Welch initiated the conversation with Harrell at the water cooler. Welch's unsolicited question to Agent Harrell"What is going to happen to me now?"triggered the conversation that eventually led to his confession. Under Bradshaw, a suspect's question regarding what would happen to him "evinced a willingness and a desire for a generalized discussion about the investigation." 462 U.S. at 1045-46, 103 S.Ct. 2830.
*215 Second, Welch's incriminating confession was made after a voluntary, knowing, and intelligent waiver of his Miranda rights. Welch was again advised of his Miranda rights before law enforcement began the second interview. The interrogating officers did not pressure Welch but waited several minutes in silence for Welch to talk after Welch indicated, "I don't know what to say," and the officer responded, "just say it." Together, these facts show that Welch understood his rights, knew how to use these rights, had an opportunity to consider the merits of silence versus confession, and intelligently decided to confess.
Where, as here, the accused had invoked his right to silence but later initiated a conversation with law enforcement and subsequently exercised a voluntary, knowing, and intelligent waiver after being advised of his rights for the second time, the resulting confession is admissible under Bradshaw. Accordingly, we find no error in the trial court's denial of Welch's motion to suppress his confession.

Instruction on the Cold, Calculated, and Premeditated Aggravator
Next, Welch argues that the trial court erred by instructing the jury on the cold, calculated, and premeditated (CCP) aggravating circumstance. Welch originally objected to the CCP instruction at the charge conference. The trial court overruled the objection and instructed on CCP. However, the trial court ultimately did not find CCP for either murder, concluding that CCP had not been proved beyond all reasonable doubt.
Because the State presented relevant evidence in support of CCP, the trial court did not err in instructing the jury regarding the CCP aggravator. Although an aggravating factor must be proven beyond a reasonable doubt, Johnson v. State, 438 So.2d 774, 779 (Fla.1983), a jury instruction on aggravators need only be supported by credible and competent evidence. See Hunter v. State, 660 So.2d 244, 252 (Fla.1995). The fact that the State does not prove an aggravating factor to the courts satisfaction does not require a conclusion that there was insufficient evidence to allow the jury to consider that factor. Bowden v. State, 588 So.2d 225, 231 (Fla.1991). Indeed, where evidence of a mitigating or aggravating factor has been presented to the jury, an instruction on the factor is required. Id.; Stewart v. State, 558 So.2d 416, 420 (Fla.1990).
Cold, calculated, and premeditated without any pretense of moral or legal justification means
that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.
Williams v. State, 967 So.2d 735, 764 (Fla. 2007) (quoting Buzia v. State, 926 So.2d 1203, 1214 (Fla.2006)), cert. denied, ___ U.S. ___, 128 S.Ct. 1709, 170 L.Ed.2d 519 (2008). CCP can be indicated "by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." Swafford v. State, 533 So.2d 270, 277 (Fla. 1988). CCP can also be proven with evidence that a defendant had the opportunity to leave the crime scene but instead committed the murder. See Alston v. State, 723 So.2d 148, 162 (Fla.1998); Jackson v. State, 704 So.2d 500, 505 (Fla.1997). *216 Proof of more time for reflection tends to show heightened premeditation. See Swafford, 533 So.2d at 277.
Here, the trial court properly instructed the jury on CCP because the State introduced credible and competent evidence in support of the aggravator. Specifically, the medical examiner stated it took Welch seven to thirty minutes, perhaps longer, to kill the two victims. This evidence tended to show heightened premeditation because Welch had time for reflection and had an opportunity to abandon the murders. Moreover, Welch's previously prepared handwritten note threatening Kyoko's life supports calculation by implying prearranged design. Additionally, the evidence demonstrating that after Welch murdered the victims, he cleaned up in the victims' bathroom, took numerous items from the victims' home, and pawned them tends to show that the murders were committed in a cold manner. Given this credible and competent evidence in support of CCP, the trial court did not err in instructing the jury on this aggravator.

Admission of Photographs
Welch also argues that the trial court erred by admitting gruesome and inflammatory photos, namely six crime scene photos and the victims' autopsy pictures. We hold that the trial court did not abuse its discretion in admitting these photographs.
As we have explained,
"The test for admissibility of photographic evidence is relevancy rather than necessity." Pope v. State, 679 So.2d 710, 713 (Fla.1996). Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived. See Looney v. State, 803 So.2d 656, 669-70 (Fla.2001). This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner's testimony, the manner of death, or the location of the wounds.
However, even where photographs are relevant, the trial court must still determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence." Czubak v. State, 570 So.2d 925, 928 (Fla.1990) (quoting Leach v. State, 132 So.2d 329, 331-32 (Fla.1961)) (second alteration in original). In making this determination, the trial court should "scrutinize such evidence carefully for prejudicial effect, particularly when less graphic are available to illustrate the same point." Marshall v. State, 604 So.2d 799, 804 (Fla.1992).
Douglas v. State, 878 So.2d 1246, 1255 (Fla.2004) (citations omitted). On appeal, this Court reviews the admission of photographs under the abuse of discretion standard. See Davis v. State, 859 So.2d 465, 477 (Fla.2003). "[T]his Court has considered the trial court's preliminary screening as a factor weighing in favor of admissibility." Anderson v. State, 863 So.2d 169, 185 (Fla.2003) (quoting Philmore v. State, 820 So.2d 919, 931 (Fla.2002)).
The six crime scene pictures were clearly relevant to show the condition of the crime scene when the police arrived and the position and location of the bodies when they were found by police. Particularly, the two crime scene pictures that show Kyoko's face and torso were relevant to illustrate the nature and manner of Kyoko's death. Thus, these photos were clearly admissible. See Looney, 803 So.2d at 669; Brooks v. State, 787 So.2d 765, 781 (Fla.2001).
*217 Moreover, the victims' autopsy pictures were relevant to show the heinous, atrocious, or cruel (HAC) aggravating circumstance. See England v. State, 940 So.2d 389, 399-400 (Fla.2006) (finding photos of decomposed victim with flesh sloughing off and insect larvae in wounds relevant to show, among other things, HAC); Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (upholding the trial court's admission of photos and videotape depicting the victim's burned body because such evidence was relevant to show the circumstances of the crime and to establish HAC and CCP). Furthermore, although these photographs are disconcerting, they are not so shocking in nature that they defeat their evidentiary value. See Bowles v. State, 979 So.2d 182, 194 (Fla.2008); England, 940 So.2d at 400. The trial court also carefully screened the photographs before admitting them. Under these circumstances, the trial court did not abuse its discretion in admitting the crime scene and autopsy photographs.

CONCLUSION
As discussed above, the trial court's failure to ask the State to provide a gender-neutral ground when Welch objected to the State's peremptory challenge to a female juror constitutes reversible error under Melbourne. We therefore vacate Welch's death sentences and remand the case to the trial court for a new penalty phase proceeding.
It is so ordered.
QUINCE, C.J., and ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
BELL, J., concurs in part and dissents in part with an opinion, in which WELLS, J., and CANTERO, Senior Justice, concur.
BELL, J., concurring in part and dissenting in part.
I agree with the majority opinion in all but one respect. I disagree with the majority's decision to grant Welch a new penalty phase based upon his peremptory challenge claim. As Justice Cantero recently explained in his dissenting opinion in State v. Whitby, 975 So.2d 1124 (Fla. 2008), this Court should join the overwhelming majority of other jurisdictions and replace Florida's procedure for addressing the discriminatory use of peremptory challenges with the well-proven process the United States Supreme Court laid out more than twenty years ago in Batson v. Kentucky, 476 U.S. 79, 106, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Under Batson, a court must (1) require the party objecting to another party's use of a peremptory strike to offer a prima facie case of purposeful discrimination; (2) ask the proponent of the peremptory strike to provide a neutral explanation for the strike once the objecting party has met the prima facie burden; and (3) determine whether the objecting party has met the burden of proving a discriminatory purpose. Whitby, 975 So.2d at 1131 (Cantero, J., dissenting) (citing Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)). As Justice Cantero pointed out,
[u]nder federal law, [the first] step "contemplates something more than simply establishing the minority status of the defendant and the exclusion of a single venire member who happens to be of the same race." That is, the federal standard requires that the party opposing the peremptory strike must object and "show[ ] that the totality of the relevant facts gives rise to an inference of discriminatory purpose."
Whitby, 975 So.2d at 1131-32 (Cantero, J., dissenting) (citations omitted).
As the majority correctly holds, under Melbourne v. State, 679 So.2d 759 (Fla. *218 1996), a party objecting to a peremptory challenge need only show that the venire member the opponent seeks to remove is either a male or a female (or a member of any racial or ethnic group). The objecting party is not required to make any prima facie showing upon which discrimination can be inferred. As others have noted and as clearly established in this case, such a rule leads to unnecessary gamesmanship and needless reversals for purely technical reasons. Here, the State's first peremptory strike was against a female venire member. There were other females on the panel. Defense counsel objected to the strike and simply noted the venire member's gender as his basis. He offered no further basis upon which discrimination could be inferred because he rightly understood that he was not required to do so under our case law. Not only did the trial judge perceive such a procedure to be absurd, defense counsel himself agreed. In response to the court's inquiry into the basis for the objection, defense counsel observed that "peremptories are a joke every person is [in] a group."
Defense counsel's assessment of our law in this area is correct. The majority is vacating an otherwise valid sentence for no reason other than the fact that the trial judge, who had absolutely no basis to infer discrimination, failed to require the State to give a gender-neutral explanation for its first peremptory strike of a female venire member (on a panel that had other females). Such a result is both unnecessary and unjust.
Accordingly, I concur in part and dissent in part.
WELLS, J., and CANTERO, Senior Justice, concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The trial court found the following aggravating circumstances: (a) prior violent felony (contemporaneous murder)great weight; (b) committed during a robberygreat weight; and (c) heinous, atrocious, or cruel great weight. Additionally, the trial court found three statutory mitigating circumstances: (a) extreme mental or emotional disturbance little weight; (b) unable to appreciate criminality or substantially impaired little weight; and (c) age-some weight. Nine nonstatutory mitigating circumstances were also found: (a) alcohol and drug abuse-little weight; (b) suicides of brother and uncle some weight; (c) posttraumatic stress syndromesome weight; (d) bipolar disorder some weight; (e) lack of psychological treatmentlittle weight; (f) neuropsychological abnormalities, including abnormal brain scanlittle weight; (g) dissociative symptomslittle weight; (h) mental, emotional, and abstract reasoning age of fifteen years little weight in addition to that already given under "statutory mitigation" category; and (i) admitted guilt and pled guiltyvery little weight.
[3] These claims are: (1) the trial court erred by admitting testimony of Welch's previous rejections of offers of cocaine; (2) the trial court abused its discretion by denying Welch's for-cause challenge; (3) the trial court erred in denying Welch's motion to suppress his confession; (4) the trial court abused its discretion in denying Welch's motion for a mistrial based on the State's impermissible reference to the victim's birthday and abused its discretion in overruling objections regarding other improper comments; (5) the trial court erred by refusing to ask the State to provide a gender-neutral reason when Welch objected to its peremptory strike of a prospective female juror; (6) the trial court abused its discretion by overruling Welch's objections to the State's argument based on "justice"; (7) the trial court erred in instructing the jury on the cold, calculated, and premeditated aggravating circumstance; (8) the trial court abused its discretion in admitting gruesome photos; (9) Welch's death sentences were not proportional; and (10) Florida's death sentencing scheme is unconstitutional.
[4] Because we reverse Welch's death sentences and remand for a new penalty phase, we do not reach the proportionality issue or the for-cause challenge issue. For the same reason, we also do not conduct our own sufficiency of the evidence analysis, do not discuss specific evidentiary issues that may not arise again (issues 1, 4, and 6) and only touch on several of the issues that will be helpful in a retrial; specifically issue 3 regarding the suppression of the confession, issue 7 regarding the CCP instruction issue, and issue 8 regarding the photos.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).